UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

PAUL RAYMO                          CIVIL ACTION NO. 6:12-cv-00023

VERSUS                              MAGISTRATE JUDGE HANNA

CARGILL INCORPORATED                BY CONSENT OF THE PARTIES


**FINDINGS  OF  FACT
AND
<u>CONCLUSIONS  OF  LAW</u>**


The plaintiff, Paul Raymo, filed suit on December 1, 2011 seeking to recover damages alleged to have resulted from an incident that allegedly occurred on or about December 7, 2010 while Mr. Raymo was directly employed by Guy Atkinson Construction Co. a/k/a Atkinson Construction, a subsidiary of Clark Construction ("Atkinson"), assigned by his direct employer to work in a salt mine operated by Cargill Incorporated ("Cargill"), at Avery Island, Louisiana, and actively engaged in the performance of his job duties.  Jurisdiction is premised on 28 U.S.C. § 1332 because this is a civil action between the citizens of different states and the amount in controversy exceeds the jurisdictional limit set forth in that statute.  The parties consented to trial of the action by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

Mr. Raymo's complaint alleges that, on or about December 7, 2010, he was working for Atkinson at Cargill's mine when he was injured.  Raymo alleges that he was assigned the task of repairing a failed bearing in a salt crusher.  To access the bearing, Raymo was allegedly required to remove a guard that was bolted to the crusher.  After removing the guard, Raymo allegedly received an electrical shock that resulted in both physical and psychological injuries.

Cargill asserted, as an affirmative defense, that Mr. Raymo was its borrowed employee and, consequently, that Cargill is immune from liability to Mr. Raymo with regard to the injury he allegedly sustained while in the course and scope of his employment.  Mr. Raymo contends that he was not Cargill's borrowed employee. Counsel for both parties consented to have the issue of Mr. Raymo's alleged borrowed employee status severed under Fed. R. Civ. P. 42 from the other issues raised in the lawsuit and tried by means of a bench trial.

The bench trial on the issue of Mr. Raymo's alleged borrowed employee status was held on February 4, 2014.

The bench trial renders Cargill's "motion for declaratory judgment" on the issue of borrowed employee status (Rec. Doc. 47) and the plaintiff's corresponding

motion on the same topic (Rec. Doc. 62 at 1) moot.  Both of those motions are, therefore, DENIED AS MOOT.[1]

The Court, having carefully considered the testimony of all of the witnesses, the exhibits entered into evidence at trial, the record of this action, the memoranda submitted by the parties, and the applicable law, now makes the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52.  To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

## FINDINGS OF FACT

Defendant Cargill operates a salt mine at Avery Island, Louisiana.  Cargill entered into a contract with Atkinson that was effective from June 1, 2010 to May 31, 2011, the terms and conditions of which governed the "performance of any work (the 'Work')" by Atkinson for Cargill.[2]  Pursuant to that contract, Atkinson provided personnel to work in Cargill's mine.  Correspondence attached to the contract indicated that Atkinson would provide two-two man crews to work as miners.  However, due to a shortage of maintenance mechanics attributed to increased demand

---

[1]        The parties agreed that all of the plaintiff's submissions in its motion [Rec. Doc. 62] would be considered as evidence in the bench trial and were admitted as such at trial.

[2]        The contract has a choice of law clause calling for the application of the law of the state where the facility is located; therefore, this Court will apply Louisiana law.

for that trade by the oil and gas industry, Cargill requested, and Atkinson supplied, personnel to work as maintenance mechanics.  The plaintiff, Mr. Raymo, was directly employed by Atkinson as a mechanic, and he was one of the workers supplied by Atkinson to work as a maintenance mechanic in Cargill's mine.

Whether borrowed-employee status exists is a question of law, but depends upon a fact-based inquiry; therefore, any factual disputes must be resolved before the Court can make the necessary legal determination.[3]

There is no fixed test for borrowed-employee status, and no single factor or combination of factors is determinative.[4]  However, there are ten relevant factors that have been recognized as being helpful in determining whether borrowed servant status exists.[5]  Those factors are:

    (1)    Who has the right of control over the employee beyond mere suggestion of details or cooperation?

---

[3]    *Stephens v. Witco Corp.*, 198 F.3d 539, 542 (5th Cir. 1999).  See, also, same principles applied with regard to immunity under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), *Hotard v. Devon Energy Production Co. L.P.*, 308 Fed. App'x 739, 741 (5th Cir. 2009); *Billizon v. Conoco, Inc*., 993 F.2d 104, 105 (5th Cir. 1993); *Brown v. Union Oil Co*., 984 F.2d 674, 676 (5th Cir. 1993); *Melancon v. Amoco Prod. Co*., 834 F.2d 1238, 1245 n. 13 (5th Cir. 1988).

[4]    *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 388 (5th Cir. 2004); *Stephens v. Witco Corp*., 198 F.3d at 542.

[5]    *U.S. Fire Ins. Co. v. Miller*, 381 F.3d at 388, citing *Ruiz v. Shell Oil Co*., 413 F.2d 310, 312-13 (5th Cir. 1969).  Although *Ruiz* involved the applicability of the LHWCA, the same factors are used in cases involving the application of Louisiana's workers' compensation statute. "Both federal and Louisiana law use the same criteria for determining whether an employee is a borrowed employee." *Capps v. N.L. Baroid-NL Industries, Inc*., 784 F.2d 615, 616 (5th Cir. 1986).

-4-

(2)   Whose work is being performed?

(3)   Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4)   Did the employee acquiesce in the new work situation?

(5)   Did the original employer terminate his relationship with the employee?

(6)   Who furnished the tools and the place of performance?

(7)   Was the new employment over a considerable length of time?

(8)   Who had the right to discharge the employee?

(9)   Who had the obligation to pay the employee?

(10)  Who selects the employee?[6]

Each of these factors was considered by the Court in making its factual findings.

**(1)   <u>Who has the right of control over the employee beyond mere suggestion of details or cooperation?</u>**

The contract between Atkinson and Cargill reads as follows: "All persons used or employed, directly or indirectly, by Contractor [Atkinson] or any Subcontractor in the performance of the Work hereinafter collectively referred to 'Contractor Employee(s)') shall be deemed to be employees or agents of Contractor and not employees or agents of Owner.  Contractor shall have and exercise exclusive control

---

[6]   *U.S. Fire Ins. Co. v. Miller*, 381 F.3d at 388.

-5-

and direction of Contractor Employees."  However,  "[t]he reality at the worksite and the parties' actions in carrying out a contract. . . can impliedly modify, alter, or waive express contract provisions."[7]

Atkinson typically provided miners or "production contractors" to work at the Avery Island mine.  Andrew Johnson, Cargill's maintenance supervisor, did not supervise the production workers but did supervise all of the maintenance mechanics.  Because Cargill was having a hard time hiring maintenance mechanics, Cargill's management asked Atkinson to provide some mechanics to work a specific shift.  Mr. Raymo was selected by Atkinson to work for Cargill as one of the maintenance mechanics.  Mr. Raymo was assigned by Cargill to Mr. Johnson's crew, which consisted of approximately five to six men, all of whom were Cargill employees except Mr. Raymo.  Mr. Johnson supervised Mr. Raymo's crew, and Mr. Raymo as it pertained to the work of a maintenance mechanic, the entire time that Mr. Raymo was employed on this job.  The entire crew rotated shifts on a weekly basis.  At the start of each day's shift, a meeting was held at which Mr. Johnson assigned specific tasks to the men on his crew without input from Atkinson.  The men performed repairs and maintenance on all of the equipment that was used in the mine.  Atkinson

---

[7]     *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988).

mechanics always worked side-by-side with Cargill mechanics, and on the day of the alleged accident, Mr. Raymo was working alongside Cargill mechanic Ricky Tate.

The senior Atkinson employee in the Cargill mine during Mr. Raymo's tenure was Atkinson mining superintendent Tom Nearhood.  Mr. Nearhood did not supervise Mr. Raymo because they worked different types of shifts and also because Mr. Raymo was a mechanic rather than a miner and worked solely with Cargill's mechanics under Mr. Johnson's supervision.  In the event that Mr. Nearhood needed the assistance of a mechanic, he was required to seek assistance through Mr. Johnson or another Cargill maintenance supervisor.  Mr. Nearhood never personally observed Mr. Raymo's work as a mechanic in the Cargill mine nor did he control, assign, supervise, or review Mr. Raymo's work.  Cargill determined what hours Mr. Raymo worked and what work he performed.

When Mr. Johnson had a problem with Mr. Raymo's performance, he first went to Mr. Nearhood to advise him of the situation but then addressed his concerns directly with Mr. Raymo and worked out the problem.  Mr. Raymo received some in-mine training from Mr. Nearhood, which was required by the contract between Cargill and Atkinson, and Mr. Raymo attended safety meetings put on by both Cargill and Atkinson.  Both Cargill and Atkinson filled out accident reports concerning the incident in which Mr. Raymo was allegedly injured.

-7-

Accordingly, the Court finds, as a matter of fact, that the contract between Cargill and Atkinson was modified to the extent that Cargill had control over Mr. Raymo when he worked at Cargill's mine.  This factor favors borrowed employee status.

**(2)     Whose work is being performed?**

Cargill was shorthanded on mechanics, and Atkinson supplied mechanics to supplement Cargill's own work force.  Had Cargill been able to hire mechanics on its own, Mr. Raymo's services would not have been needed.  At the Avery Island mine, Mr. Raymo always worked alongside a Cargill mechanic, and he was working alongside Cargill employee Ricky Tate when he was allegedly injured.  Mr. Raymo testified at his deposition that he was hired to train Cargill's mechanics but this contention was denied by both Mr. Johnson of Cargill and Mr. Nearhood of Atkinson. Although he was doing the same type of work that his direct employer hired him to perform, i.e. maintenance mechanic, while at Cargill he was performing the work on Cargill's equipment in order to accomplish Cargill's work of mining for salt. Accordingly, the Court finds, as a matter of fact, that Mr. Raymo was, at all times that he worked in Cargill's mine, performing Cargill's work.  This factor favors borrowed employee status.

### (3)   Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

The contract between Cargill and Atkinson evidences a meeting of the minds as to the fundamental fact that Atkinson employees were used to perform work in Cargill's mine.  Although the contract states that "Contractor [Atkinson] shall have and exercise exclusive control and direction of Contractor Employees," the Court finds that the meeting of the minds expressed in the contract between Atkinson and Cargill was altered by the course of conduct implemented when Atkinson's mechanics actually went to work in Cargill's mine.  As noted previously, "[t]he reality at the worksite and the parties' actions in carrying out a contract. . . can impliedly modify, alter, or waive express contract provisions."[8]  Specifically, this Court finds there was a meeting of the minds between Cargill and Atkinson, notwithstanding the contract's provision, that while Mr. Raymo was nominally employed by Atkinson, and for administrative and human resource issues Atkinson remained in control, Mr. Raymo worked exclusively under the supervision and control of Cargill when it came to performance of the work as a maintenance mechanic.  This factor favors borrowed employee status.

---

[8]    *Melancon v. Amoco Production Co.*, 834 F.2d at 1245.

-9-

**(4)** **Did the employee acquiesce in the new work situation?**

The focus of this inquiry is "whether the employee was aware of his work conditions and chose to continue working in them."[9]   Mr. Raymo was hired by Atkinson as a mechanic assigned to work in Cargill's mine because he had experience working in the hostile environment of underground mines.  Mr. Raymo accepted the job assignment, he moved to Louisiana from his home state of New York, and he remained on the job for a period of several months.  There is no evidence that he ever objected or complained to Mr. Nearhood or to Mr. Johnson about his being assigned to work for Cargill in Louisiana.  Therefore, the Court finds that Mr. Raymo acquiesced in the work situation.  This factor favors borrowed employee status.

**(5)** **Did the original employer terminate his relationship with the employee?**

This factor examines "the nature of the lending employer's relationship with the employee while the borrowing occurred."[10]  Furthermore, "[t]his factor does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed employee' doctrine."[11]  When the ties remaining between the direct employer, i.e. Atkinson, and

---

[9]      *U.S. Fire*, 381 F.3d at 389.

[10]      *U.S. Fire*, 381 F.3d at 389.

[11]      *Melancon v. Amoco Production Co.*, 834 F.2d at 1246.

-10-

the allegedly borrowed employee, Raymo, are minimal and purely administrative, this factor favors borrowed-employee status.[12]

Administrative ties remained between Atkinson and Mr. Raymo during his tenure at the Avery Island mine.  If he had questions with insurance or payroll matters, for example, he could address those to Mr. Nearhood.  Atkinson also provided Mr. Raymo with some training and required him to attend weekly safety meetings conducted by Atkinson personnel.  An Atkinson accident report was filled out when Mr. Raymo was allegedly hurt while working in the mine, and Atkinson required that Mr. Raymo seek medical treatment following the incident.  But control over the shift that he worked and the tasks that he performed was totally and completely transferred from Atkinson to Cargill.  The Court finds that this factor does not overwhelmingly weigh in favor of borrowed employee status and considers it to be neutral.

### (6)    <u>Who furnished tools and the place for performance?</u>

It is undisputed that Cargill furnished the place where Raymo performed his work – the Avery Island salt mine.  In ruling on Cargill's prior motion for summary judgment, the Court found that this factor was neutral.  This conclusion was based on

---

[12]     *Musa v. Litton-Avondale Industries, Inc.*, 10-627 (La. App. 5 Cir. 03/29/11), 63 So.3d 243, 249, *writ denied*, 2011-1256 (La. 09/23/11), 69 So.3d 1163.

the parties' agreement that Mr. Raymo used Cargill's tools in performing his work but also brought his own specialty tools to the worksite in Avery Island, including some safety equipment.

However, the evidence presented at trial shows that, with a single exception, the tools that Mr. Raymo used while working in the Avery Island mine were provided by Cargill.  Cargill provided Mr. Raymo with pneumatic impact wrenches, basic hand wrenches, and specialty tools needed for working on the larger pieces of mining equipment.  For his own convenience, Mr. Raymo brought an 18-volt cordless impact wrench of his own into the mine.  He could use the cordless wrench without the necessity of depending on an air compressor at all times.  But Atkinson did not require Mr. Raymo to bring any tools with him when he reported for work in Cargill's mine and, aside from the one cordless wrench, all other tools used by Mr. Raymo were provided by Cargill.  In fact, the wrench that he was using when he was injured was provided by Cargill.

Mr. Nearhood does not recall specifically whether Atkinson provided Mr. Raymo with the protective gear that was required for work in the mine, although he allowed that it was Atkinson's "intent" that its employees have all necessary personal protective equipment ("PPE").  In his deposition testimony Mr. Nearhood said that Atkinson "probably" provided his first set of PPE but "after that Cargill picked it up

-12-

and provided the PPE." He also said that when a man was hired by Atkinson "we might give them a hard hat; most of them bring their own." He also said that Atkinson "normally" provides a W65 self-contained self-rescuer. He did not testify that Atkinson provided Mr. Raymo with a W65, a hard hat, or any other protective devices.

Even if Atkinson did provide PPE to its employees who were working in Cargill's mine, Cargill paid for the equipment. Either Atkinson obtained the equipment from Cargill's warehouse or Atkinson procured the equipment then billed Cargill for it. Similarly, Atkinson had a forklift or materials handler, an all terrain vehicle, and other equipment in the mine that it rented to Cargill.

Mr. Raymo testified that he owned all of his personal safety equipment, including his hard hat, but that Cargill supplied him with gloves and a head lamp. He also testified that he provided a few specialty tools that Cargill did not own. It is unclear whether these were tools he personally owned or tools that Atkinson owned.

The jurisprudence supports a distinction between providing the place of performance and major tools for doing the work and providing the protective equipment necessary to do the job safely. For example, one Louisiana case found that when the alleged borrowing employer provided tools such as cutting torches, grinders, and electrodes, and the employees furnished their own safety equipment,

-13-

such hard hats, safety glasses, steel-toed shoes, gloves, and welding shields, the arrangement supported a finding of borrowed servant status.[13]  Similarly, this factor was found to favor borrowed employee status when the borrowing employer furnished the place of performance, the principal pieces of equipment (a wireline unit and lubricator) while the direct employer provided tool boxes, hand tools, safety equipment and certain specialized tools.[14]  This factor was also found to favor borrowed employee status when the direct employer provided a welding machine and related equipment, the employee provided his own safety equipment, and the borrowing employer provided the place of performance, transportation to and from the place of work, food, and lodging.[15]  Consistently, the Court finds that this factor favors borrowed employee status in this case.

### (7)    Was the new employment over a considerable length of time?

---

[13]     *Sanchez v. Harbor Const. Co., Inc.* 2007-0234 (La. App. 4 Cir. 10/03/07), 968 So.2d 783, 788.  See, also, *Pradia v. Southern Personnel of La., Inc.*, 2000-0365 (La. App. 3 Cir. 10/11/00), 776 So.2d 474, 480 (the court affirmed borrowed employee status where the direct employer furnished only safety equipment to the workers and the borrowing employer furnished the tools and the facility for performing the work but without finding that this factor specifically supported borrowed employee status).

[14]     *Owen v. Chevron U.S.A. Inc.*, 8 F.3d 20, at *4 (5th Cir. 1993) (unpublished opinion).

[15]     *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1246 (5th Cir. 1988).

-14-

"Where the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the converse is not true."[16] When the length of employment is not considerable, this factor is neutral.

The contract between Cargill and Atkinson covered the period of time from June 1, 2010 to May 31, 2011 and provided that Atkinson would provide men to work for Cargill for a period of one year.  Mr. Raymo was allegedly injured on or about December 7, 2010, after having worked in the mine for approximately two or three weeks.

The Fifth Circuit has confirmed a finding of borrowed-employee status when the worker was injured on his first day on the job,[17] but that does not mean that employment of a day or more is "considerable" employment that always supports a finding of borrowed-employee status.  Focusing on the actual time that the injured employee worked before the injury, courts have found that the period of employment was not "considerable" and this factor was neutral when the worker was on the job

---

[16]    *Capps v. N.L. Baroid–NL Indus., Inc.*, 784 F.2d at 618; *Brown v. Union Oil Co.*, 984 F.2d at 679.

[17]    *Capps v. N.L. Baroid–NL Indus., Inc.*, 784 F.2d at 618; *Champagne v. Penrod Drilling Co.*, 341 F.Supp. 1282, 1284 (W.D. La. 1971), *aff'd per curiam*, 459 F.2d 1042 (5th Cir. 1972), *cert. denied*, 409 U.S. 1113 (1973).

for approximately one month[18] and for approximately three months.[19]  However, a period of sevens months duration has been found sufficient to constitute a considerable employment period.[20]

The record of this case does not establish how long Mr. Raymo worked in the Cargill mine.  His accident occurred two to three weeks after he began working in the mine and he continued to work there for a period of some months thereafter, but his precise start and stop dates are not in the record.

Accordingly, the Court finds that Cargill did not establish that Mr. Raymo was employed at the Avery Island mine for a considerable period of time.  This factor is, therefore, neutral.

**(8)   <u>Who had the right to discharge the employee?</u>**

Cargill had the right under the contract to terminate the agreement and to cancel any unperformed work if it was defective or nonconforming.  Cargill also had the right to bar Atkinson's employees from its workplace.  But Cargill did not have

---

[18]    *Brown v. Union Oil Co. of California*, 984 F.2d at 679.

[19]    *Lemaire v. Danos & Curole Marine Contractors Inc*., 265 F.3d 1059, 2001 WL 872840, at *7 (5th Cir. 2001) (unpublished); *Billizon v. Conoco, Inc.*, 993 F.2d 104, 106 (5th Cir. 1993).  See, also, *Bankston v. LSU Health Sciences Center*, 2008-1334 (La. App. 3 Cir. 04/01/09), 7 So.3d 170, 180-81, (this factor was neutral when the employment was for a period of approximately four months.)

[20]    *Musa v. Litton-Avondale Industries, Inc.*, 10-CA-627 (La. App. 5th Cir. 03/29/11), 63 So.3d 243, 249, *writ denied*, 69 So.3d 1163 (La. 09/23/11).

-16-

the right to discharge Atkinson employees from their employment with Atkinson. Therefore, this factor does not favor borrowed employee status.

**(9)    Who had the obligation to pay the employee?**

It is undisputed that Atkinson remained Mr. Raymo's direct employer while he was working at the Avery Island mine.  At all material times, Mr. Raymo received his paycheck from Atkinson.  It is equally undisputed, however, that Atkinson invoiced Cargill for Mr. Raymo's labor and, as a practical matter, paid Mr. Raymo out of the funds it billed to Cargill.  Correspondence attached as an exhibit to the contract between Cargill and Atkinson sets forth a billing and payment arrangement. Although the correspondence predates the time covered by the relevant contract, it was submitted by Mr. Raymo and represented to be a part of the contract.  Therefore, it must be assumed that the arrangement described in the correspondence – or a similar arrangement – was in place at the time that Mr. Raymo was working in Cargill's mine.

Louisiana courts have held that this factor "focuses on who provided the funds to pay the employee, not from which employer's bank account the employee's paychecks originate."[21]  Therefore, Louisiana courts have found that when the direct employer pays the worker but the purported borrowing employer pays the direct

---

[21]     *Manning v. Sampson*, 10-CA-151 (La. App. 5 Cir. 10/12/10), 50 So.3d 908, 912.

employer, this is sufficient to support a finding of borrowed employee status.[22]  Stated another way, the Fifth Circuit has concluded that when the direct employer pays the employee based on time tickets verified by the purported borrowing employer, this factor weighs in favor of borrowed employee status.[23]

In this case, each Atkinson employee filled out three forms each day and turned those forms in to Mr. Nearhood.  Mr. Nearhood then compiled on his computer a joint time card for all of the Atkinson employees working in the mine and forwarded that time card to Atkinson's office in Colorado.  Although there is no evidence that Cargill reviewed the documents filled out each day by the individual Atkinson employees or the joint time card filled out each day by Mr. Nearhood, the Court finds that the procedure followed by Atkinson and Cargill in this instance was sufficient to support the conclusion that Atkinson paid its employees with money it received after billing Cargill.  Therefore, this factor favors borrowed employee status.

**(10)   Who selects the employee?**

The final factor is which party selected the employee.  In this case, it is undisputed that Atkinson selected Mr. Raymo to work in Cargill's salt mine and

---

[22]      See, e.g., *Capps v. N.L. Baroid-NL Industries, Inc.*, 784 F.2d at 618; *Melancon v. Amoco Production Co.*, 834 F.2d at 1246.

[23]      *Billizon v. Conoco, Inc.*, 993 F.2d at 105. See ,also, *Robertson v. W&T Offshore, Inc.*, 712 F.Supp.2d 515, 534 (W.D. La. 2010).

Cargill had no input in his hiring.  Therefore, this factor does not favor borrowed employee status.

## CONCLUSIONS OF LAW

This is a diversity action; therefore, Louisiana's substantive law applies.[24]  The Louisiana legislature codified the borrowed employee doctrine by enacting La. R.S. 23:1031(C).  That statute expressly refers to direct employers as "general employers" and to borrowing employers as "special employers."  It also states that both "[t]he special and the general employers shall be entitled to the exclusive remedy protections provided in R.S. 23:1032."

Under La. R.S. 23:1032, which is a part of Louisiana's Workers' Compensation Act, an employee injured in the course and scope of his employment due to his employer's or coworker's negligence cannot sue his employer in tort but is instead limited to receiving workers' compensation benefits.[25]  The exclusivity provision of the state's workers' compensation law applies not only to the direct employee-employer relationship but also to the statutory employer-employee relationship[26] and

_____

[24]     *Ashland Chemical, Inc. v. Barco Inc.*, 123 F.3d 21, 265 (5th Cir. 1997); *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

[25]     La. R.S. 23:1032.

[26]     La. R.S. 23:1061(A)(1) (when any "principal". . . undertakes to execute any work, which is a part of his trade, business, or occupation and contracts with any person. . . for the execution. . . of the whole any part of the work undertaken by the principal, the principal, as a

-19-

the borrowed employee relationship.[27]  The exclusivity provision does not apply when the injured worker alleges that he was injured due to an intentional act.[28]  In this case, however, there is no allegation that Mr. Raymo's injury resulted from an intentional act.  The Court previously found, as a matter of law, that Raymo was not Cargill's statutory employee at any material time, and the Court further found that genuine issues of material fact precluded summary judgment in Cargill's favor on the issue of borrowed-employee status.  (Rec. Doc. 42).

Cargill raised the issue of its alleged immunity from liability as an affirmative defense.  Therefore, Cargill bears the burden of proof on this issue and must establish all of the essential elements of the defense to warrant judgment in its favor.[29]

Upon careful review of the evidence presented and after deciding all material factual issues, the Court finds that six of the ten factors that must be considered favor a finding that Mr. Raymo was, at all relevant times, Cargill's borrowed employee.  Therefore, the Court concludes, as a matter of law, that Mr. Raymo was Cargill's borrowed employee.  As Mr. Raymo's borrowing employer, Cargill is immune from

---

statutory employer, shall be granted the exclusive remedy protections of R.S. 23:1032. . . .)

[27]    See, e.g., *Griffin v. Wickes Lumber Co.*, 2002-0294 (La. App. 1 Cir. 12/20/02), 840 So.2d 591, 596, *writ denied*, 2003-1338 (La. 09/19/03), 853 So.2d 640.

[28]    La. R.S. 23:1032(A)(1)(a); La. R.S. 23:1032(B).

[29]    *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

-20-

tort liability for any injuries that Mr. Raymo may have sustained while in the course and scope of his employment in Cargill's mine.  Mr. Raymo's claim against Cargill must, therefore, be dismissed with prejudice.

### CONCLUSION

The Court concludes that Paul Raymo was, at all material times, the borrowed employee of the defendant, Cargill, Incorporated ("Cargill"), and that Cargill is immune from tort liability to Mr. Raymo in connection with any injury he might have sustained during the course and scope of his employment as Cargill's borrowed employee.  Therefore, Mr. Raymo is not entitled to recover any damages from the defendant.  Judgment in favor of the defendant, dismissing Mr. Raymo's claim against Cargill with prejudice, will be entered.

Signed at Lafayette, Louisiana, on February 7th, 2014.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

-21-